## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GREG ROYBAL,

     Plaintiff,

v.                                     No. 2023-CV-01094

WEXFORD HEALTH SOURCES, INC., AISTE
CHAMBLIN, CNP, in her official and individual
capacity; CHIRAG ACHARYA, MD, in his official
and individual capacity; ROBERT SMITH, MD, in
his official and individual capacity; RONALD
SMITH, in his official and individual capacity;
MINDY LEWIS, in her official and individual
capacity; LEANNE FUDOR, in her official and
individual capacity; NEIL FISHER, in his official
and individual capacity: DR. KESHAB PAUDEL,
in his official and individual capacity; ELIZABETH
CARAVEO, in her official and individual capacity;
RONALD J. SMITH, in his official and individual
capacity; THOMAS M. LEHMAN, MD, in his
official and individual capacity;  DIANA L.
GROVER, in her official and individual capacity;
ALISHA TAFOYA, SECRETARY OF
CORRECTIONS, in her official and individual
capacity; WENCE ASONGANYI, NMCD
HEALTH SERVICES ADMINISTRATOR, in his
official and individual capacity; HOPE SALAZAR,
Director of NMCD Office of Inspector General in
her official and individual capacity, or in the
alternative the Acting Director of NMCD Office of
Inspector General in their official and individual
capacity; ORION STRADFORD, Bureau Chief for
NMCD's Office of Internal Audits and Standards
Compliance in his official and individual capacity,
or in the alternative the Acting Bureau Chief for
NMCD's Office of Internal Audits and Standards
Compliance, in their official and individual
capacity;  STEVE MADRID, NMCD Statewide
Grievance Manager in his official and individual
capacity, or in the Alternative Acting Statewide
Grievance Manager, in  their official and individual

capacity; THE GEO GROUP, INC.; CPT. JOSHUA
FIKE, in his official and individual capacity; SGT.
LEO GOMEZ, in his official and individual
capacity,  SGT. JESSICA JAIMES, in her official
and individual capacity,

       Defendants.

**COMPLAINT FOR DAMAGES**
**FOR DEPRIVATION OF CIVIL RIGHTS AND DEMAND FOR JURY TRIAL**

Plaintiff, Greg Roybal ("Mr. Roybal" or "Plaintiff"), by and through his attorneys Collins & Collins, P.C. (Parrish Collins) and DeLara | Supik | Odegard P.C. (Christopher J. DeLara, Christopher J. Supik, David C. Odegard, and Alisa Wigley-DeLara), and pursuant to 42 U.S.C. §§ 1983 and 1988, brings this action to redress violations of his Eighth Amendment rights under the United States Constitution (incorporated via the Fourteenth Amendment), and alleges, based on personal knowledge as to his own experiences and otherwise on information and belief, as follows:

## I. JURISDICTION AND VENUE

1.     All acts complained of herein occurred in Lea County, New Mexico.

2.     This action arises under the Eighth Amendment (by incorporation via the Fourteenth Amendment) to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

3.     Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331.

4.     This Court has personal jurisdiction over each of the entities and individual Defendants because, upon information and belief, all Defendants are domiciled in the State of New Mexico and/or have substantial contacts in the State of New Mexico and purposefully availed themselves by conducting business in New Mexico.

5.     Venue is proper here under 28 U.S.C. § 1391(b)(2), because, upon information and belief, a majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

6.      Plaintiff exhausted administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e).

## II. PARTIES

**A.    Plaintiff**

7.      Mr. Roybal is a citizen of the United States and the State of New Mexico.

8.      Mr. Roybal was, at all relevant times to this Complaint, in the custody of NMCD, housed at Lea County Correctional Facility ("LCCF"), an NMCD prison facility located in Hobbs, Lea County, New Mexico.

9.      Mr. Roybal remains in the custody of NMCD at LCCF as of the filing of this Complaint.

**B.    Wexford Health Sources, Inc. and Individual Defendants**

10.     Defendant Wexford is a for-profit foreign corporation registered to do business in New Mexico, whose registered agent is in Hobbs, New Mexico.

11.     Wexford, by the terms of Professional Services Contract # 20-770-1200-0043 (the "PSC"), was contracted by NMCD for the purposes of providing medical care to inmates in the NMCD prison system, including Mr. Roybal.

12.     Upon information and belief, the PSC was executed in Santa Fe, New Mexico and the term of the PSC began on or about October 18, 2019.

13.     The PSC was in effect at all times relevant to this Complaint.

14.     Under the PSC, Wexford was acting as the apparent and actual agent, servant, and contractor of NMCD, under the color of state law, and was responsible for the care, health, safety, and proper medical treatment of all inmates in NMCD's facilities, including Mr. Roybal.

15.    Pursuant to the PSC, Wexford adopted NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own and NMCD adopted Wexford's policies, practices, habits, customs, procedures, training, and supervision as its own.

16.    Wexford acted by and through its owners, officers, directors, employees, staff, agents, or apparent agents, including, but not limited to, administrators, management, medical personnel, nurses, doctors, technicians, and other staff, including those named herein in their individual capacities.

17.    At all material times, Wexford maintained policies, customs and practices that were the moving force behind the violations of Mr. Roybal's constitutional rights.

18.    At all times relevant to this Complaint, the following named Defendants acted as employees, staff or agents of Wexford.  Each held responsibility for overseeing the training, staffing, and supervision of medical, psychiatric, mental health and behavioral health personnel working at LCCF facility:  Each is named in their individual and official capacities:

a.    Wexford Southern Regional Manager (LCCF): Mindy Lewis.

b.    Responsible Health Authority and psychiatrist:  Ronald J. Smith, Pysd, CCHP-MH.

c.    Transitional Regional VP of Operations/Utilization management: Diana L. Grover.

19.    At all times relevant to this Complaint, the following named Defendants acted as employees, staff or agents of Wexford.  Each failed to provide adequate medical care to Mr. Roybal and actively ignored his ongoing requests for medical treatment for ongoing and extreme pain caused by an untreated infection.   They are each named in their individual and official capacities:

a.    Chirag Manharlal Acharya, MD, served as a LCCF Medical Director and along with Aiste Chamblin, CNP held primary responsibility for the medical care of Mr. Roybal.

b.    Aiste Chamblin, CNP held along with Dr. Acharya primary responsibility for the medical care of Mr. Roybal.

c.    Deborah Ann Vail, RN was a nurse involved in the care of Mr. Roybal and, upon information belief, under the supervision of Dr. Acharya and Nurse Chamblin.

d.    Ronald J. Smith, Pysd, CCHP-MH served as LCCF Responsible Health Authority.

e.    Mindy Janelle Lewis, RN was a nurse involved in the care of Mr. Roybal and, upon information belief, under the supervision of Dr. Acharya and Nurse Chamblin. She also served as Wexford Southern Regional Manager, which included LCCF.

f.    Robert Smith, MD, upon information and belief, held responsibility for referrals out to third party medical providers under Wexford's Collegial Review (Utilization Management/Utilization Review) processes and procedures.

g.    Leanne Fudor, RN, BSN, Director of Utilization Management held responsibility for referrals out to third party medical providers under Wexford's Collegial Review (Utilization Management/Utilization Review) processes and procedures.

**C.    The GEO Group, Inc. and Individual Defendants**

20.    Defendant GEO is a for-profit, foreign corporation registered to do business in New Mexico whose registered agent is in Roswell, New Mexico.

21.    At all relevant times, Lea County contracted with NMCD to house NMCD inmates.

22.    The terms of the contracts require GEO to follow all NMCD policies and procedures.

23.    At all material times, GEO acted through its owners, officers, directors, employees, staff, agents, or apparent agents, including, but not limited to, administrators, management, corrections officers, and other staff, including those named herein in their individual capacities.

24.    Pursuant to GEO's contract, GEO adopted Lea County NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own.

25.    At all times relevant to this Complaint, the following named Defendants acted as employees, staff or agents of GEO.  Each was deliberately indifferent to the serious and obvious severe pain suffered by Mr. Roybal.    They are each named in their individual capacities:

   a.    Cpt. Joshua Fike was at all relevant times a correctional officer employed by GEO.  Cpt. Fike knew that Mr. Roybal was complaining of severe 10/10 pain and that he was having trouble walking.  Cpt. Fike accused Mr. Roybal of using drugs, faking his pain and seeking drugs.

   b.    Sgt. Leo Gomez knew that Mr. Roybal was complaining of severe 10/10 pain, that he was having trouble walking and that he was crying.  Sgt. Gomez accused Mr. Roybal of using drugs, faking his pain and seeking drugs.

   c.    Sgt. Jessica Jaimes knew that Mr. Roybal was complaining of severe 10/10 pain, that he was having trouble walking and that he was crying.  Sgt. Jaimes accused Mr. Roybal of using drugs, faking his pain and seeking drugs.

**D.    NMCD Individual Capacity Defendants**

26.    NMCD retains ultimate authority over LCCF and LCCF is operated in accordance with NMCD rules, policies, and procedures.

27.    NMCD is an entity of the State of New Mexico that retains ultimate authority and responsibility over the conditions of confinement and access to medical care of all NMCD inmates, including Mr. Roybal.

28.    NMCD contracted directly with Wexford under the PSC for the provision of medical services to NMCD inmates in the custody of LCCF, including Mr. Roybal.

29.    Defendant Alisha Tafoya was, at all times relevant to this Complaint, the Secretary of Corrections for NMCD. NMCD's Secretary of Corrections is the "chief executive and administrative officer" of NMCD.  NMSA § 9-3-4. Although "organizational units of [NMCD] and the officers of those units . . . have all of the powers and duties enumerated in the specific laws involved . . . the carrying out of those powers and duties [is] subject to the direction and supervision of the secretary, and [he] shall retain the final decision-making authority and responsibility" as chief executive to that department. NMSA § 9-3-12.

30.    Defendant Wence Asonganyi was, at all times relevant to this Complaint, NMCD Health Services Administrator ("HSA") with oversight authority over medical care provided to NMCD inmates. As HSA for NMCD, Mr. Asonganyi maintained direct oversight over independent medical contractors, ensuring that NMCD contractors provided adequate care to NMCD inmates, including those at LCCF and specifically Mr. Roybal.

31.    Upon information and belief, Defendant Hope Salazar was, at all times relevant to this Complaint, the Director of NMCD Office of Inspector General which oversees Internal Audits and Standards Compliance (IASC), which oversees private prison contract compliance, American Correctional Association compliance, quality assurance and conditions of confinement for the incarcerated. In the alternative, Plaintiff also names the Acting Director of NMCD Office of Inspector General from September 12, 2020, through December 7, 2020.

32.    Upon information and belief, at times relevant to this Complaint, Orion Stradford was the Bureau Chief for NMCD's Office of Internal Audits and Standards Compliance (IASC). In the alternative, Plaintiff also names the Acting Bureau Chief for NMCD's Office of Internal Audits and Standards Compliance from September 12, 2020, through December 7, 2020.

33.    Upon information and belief, at times relevant to this Complaint, Steve Madrid served as Statewide Grievance Manager with oversight responsibility over medical grievances, including the determination of whether any were found in favor of an inmate. In the alternative, Plaintiff also names the Acting Statewide Grievance Manager from September 12, 2020, through December 7, 2020.

34.    Upon information and belief, Defendants Alisha Tafoya, Wence Asonganyi, Hope Salazar, Orion Stradford and Steve Madrid (collectively "NMCD Defendants") had the authority and responsibility to oversee the medical care provided in NMCD facilities, including LCCF, and such oversight responsibilities included the proper implementation of, and adherence to, NMCD policies and compliance with contractual terms by its employees and contractors.  They are sued in their individual capacities.

35.    By the terms of the PSC, NMCD maintained authority over Wexford through its authority to terminate the contract with or without cause.

36.    Any of the NMCD Defendants, in their individual capacity, could intercede on behalf of NMCD if independent medical contractors failed to provide constitutionally adequate medical care to NMCD inmates.

37.    Any of the NMCD Defendants, in their individual capacity, could intercede on behalf of an inmate to act on a medical grievance.

38.     Any of the NMCD Defendants could intercede to enforce appropriate policies, customs and practices, but instead maintained their own and acquiesced in the policies, customs, and practices of Wexford that were the moving force behind the violations of Mr. Roybal's constitutional rights.

E.     **All Defendants**

39.     At all times relevant to this Complaint, each of the above-named Defendants was an employee and/or agent of a New Mexico State-run entity or a private medical service responsible for treating State prisoners, a task which was ultimately the responsibility of the State. Accordingly, all Defendants were acting under color of state law at all relevant times.

40.     All individually named NMCD Defendants are sued in their individual capacities.

41.     All individually named Wexford and GEO Defendants are sued in their individual and official capacities..

42.     All corporate Defendants are sued as a result of policies, customs, and practices that were the moving force behind the violations of Mr. Roybal's constitutional rights.

### III.  STATEMENT OF FACTS

A.     **Months of Reporting of Pain and Disability**

43.     Mr. Roybal was 50 years old at the time the ongoing medical neglect began in September of 2020.

44.     On September 12, 2020, Mr. Roybal had an acute onset of severe back pain with a progressive worsening of the pain and physical impairment through December 11, 2020.

45.     During this 3-month period, Mr. Roybal consistently reported 10/10 pain levels, pleading for medical help.

46.     On September 12, 2020, Mr. Roybal presented to a Wexford medical provider _____ with complaints of pain to the left side of his ribs into his lower back.  The pain was rated as a 10 out of 10, with limited range of motion.

47.     Three days later, on September 15, 2020, Mr. Roybal presented to _____ with complaints of pain in the lower spine.  He also reported pain in his mid-back that radiated to other body parts.  Mr. Roybal rated his pain at a 10 out of 10.  He also noted a weak grasp and an inability to move his legs due to pain.  On the same day, he was seen by either Defendant Chamblin, or Defendant Acharya, with continued complaints of pain to his mid-back, which were described as sharp with radiation to other body parts, and pain to his lower back.

48.     Despite reports of severe pain in his mid-back/thoracic spine, Mr. Roybal was diagnosed with low back pain and an x-ray of his lumbar spine was recommended and ordered by Defendant Nurse Chamblin, but no diagnostics of the thoracic spine were ordered.

49.     Due to ongoing reporting of 10/10 pain, Mr. Roybal was prescribed antibiotics, but no further diagnostics were ordered by Defendants Nurse Chamblin, Dr. Acharya, or Dr. Smith.

50.     No diagnostic treatment recommendations were made on September 15, 2020, to address Mr. Roybal's thoracic spine complaints.

51.     Following the normal findings of the lumbar spine x-ray, Defendant Chamblin failed to make any additional recommendations to ascertain the cause of Mr. Roybal's ongoing severe mid-back pain.

52.     On October 1, 2020, Mr. Roybal completed a health service request form and referred to it as an "EMERGENCY" noting that he had been "hurting really bad" for the last two days after he stopped taking the antibiotics and that he was "having a hard time standing up," and that "the pain is getting worse every day."

53.    He was evaluated the same day and again diagnosed with acute low back pain.  A CT scan of his lumbar spine was recommended and he was prescribed another course of oral antibiotics.

54.    Again, no diagnostic treatment recommendations were made on October 1, 2020, to address Mr. Roybal's thoracic spine complaints. Remarkably, a CT scan of the lumbar spine **only** was ordered by Nurse Chamblin on October 28, 2020, and completed on October 29, 2020, at Lea Regional Medical Center.  Not surprisingly, there were no significant findings other than a disk bulge at the L5 level.

55.    On October 17, 2020, Mr. Roybal submitted a health service request stating:

> My back is killing me.  I have severe pain halfway up my back.  I have not been able to sleep for 2 days.  They too X-ray, blood, gave me cortisone shot/steroid but it was just getting worse.  Please I need help.

56.    It was not until November 9, 2020, that Mr. Roybal was diagnosed with mid-back pain, despite consistent reporting by Mr. Roybal.  At that time, Mr. Roybal rated the pain in his mid-back at 9/10 and also reported difficulty walking.

57.    Yet, despite the diagnosis of mid-back pain, the medical provider, believed to be Defendant Chamblin or Defendant Acharya, continued to focus on the lower back, noting that the CT of the lumbar spine was within normal limits.

58.    Despite these concerns, no diagnostic or treatment recommendations were made to address Mr. Roybal's ongoing thoracic spine complaints.

59.    On November 23, 2020, Mr. Roybal was seen for continued complaints of mid-back pain, noted as ongoing for many months.  Still, no diagnostic treatment recommendations were made to address Mr. Roybal's ongoing thoracic spine complaints.

60.    On November 30, 2020, Mr. Roybal submitted a health service request form addressed specifically to "Provider Chamblin" for "undiagnosed back pain." Mr. Roybal complained that he still had "bad pain on my back" and asked if he could have an MRI or a "shot" because "we need to find out what it is." Mr. Roybal specifically asked if there might be a spinal epidural abscess.

61.    Mr. Roybal's complaints were not treated as an emergency, rather, he was scheduled to be seen almost two weeks later on December 11, 2020, left to continue suffering extreme pain in the interim.

62.    On December 7, 2020, after complaints and requests for help to address 3 months of severe thoracic back pain rated at or near a level of 10 out of 10, Mr. Roybal was finally recommended and approved to have an MRI of his thoracic and lumbar spine. This was the first time any diagnostic test had been recommended to include the thoracic spine.

63.    The MRI of the thoracic spine revealed a diffuse abnormal signal in the T9 and T10 vertebrae crossing the disk space extending anteriorly and laterally, most consistent with acute osteomyelitis of the T9 and T10 vertebrae.

64.    On December 12, 2020, Mr. Roybal was transferred to UNM Hospital for osteomyelitis. A repeat MRI of the thoracic spine was completed and revealed unchanged findings of T9-T10 osteomyelitis discitis with confluent ventral and lateral epidural phlegmon, which resulted in moderate to severe spinal canal stenosis and severe bilateral neural foraminal narrowing at T9-T10. Superior spread to the T8 vertebral body level and epidural phlegmon extending to T7-T8 and T10-T11 were also noted.

65.    Mr. Roybal was started on an antibiotic regimen, which included injections and IV medications to address the spine infection.

66.     On December 13, 2020, Mr. Roybal underwent pedicle screw placements at T6, T7, T8, T11 and T12 for segmental fixation; left transpedicular approach for biopsy of T9-T10 disk space; posterolateral fusion from T6-T12 with autograft and allograft; and correction of the kyphotic deformity.

67.     For 3 months prior to his surgery, Mr. Roybal presented with red flag symptoms suggestive of a spinal infection in his thoracic spine warranting immediate diagnostics

68.     The inexcusable, reckless and deliberately indifferent 3-month delay in thoracic spine diagnostics caused Mr. Roybal severe injury and harm to include the need for a T6-T12 posterior fusion/fixation.

69.     All individually named Wexford and GEO personnel were aware:

a.      Mr. Roybal was suffering with severe pain for at least 3 months, beginning on September 15, 2020, with reporting of 10/10 mid-back and radiating pain.

b.      Mr. Roybal had a history of intravenous drug use, increasing the risks for osteomyelitis which, as early as October 26, 2020, raised a concern for provider that Mr. Roybal might be suffering osteomyelitis.

c.      That there had been a large number of instances of spinal infections, including osteomyelitis, discitis and sepsis among inmates in the custody of NMCD, including inmates at LCCF.

70.     Rather than insuring proper diagnostics and treatment for Mr. Roybal for persistent reports of severe mid-back pain, the individually named Wexford personnel focused entirely on his lumbar spine, never arranging for thoracic diagnostics until December 11, 2020.

71.     Despite multiple opportunities to refer Mr. Roybal for a higher level of care, Defendants Wexford, Nurse Chamblin, Dr. Acharya, Dr. Smith and the Doe Medical personnel

were deliberately indifferent to Mr. Roybal's serious medical needs. These providers focus on Mr. Roybal's lumbar spine in the context of normal diagnostic findings involving the lumbar spine and ongoing and debilitating pain complaints involving the thoracic spine essentially amounted to no care provided at all to Mr. Roybal.

72.    Instead, Wexford personnel, specifically Nurse Chamblin, accused him of using drugs, faking and drug seeking.

73.    The result of the reckless disregard and deliberate indifference to Mr. Roybal's serious medical condition caused him significant harm, prolonged pain and suffering, and life-long disability.

74.    Upon information and belief, the individually named GEO personnel knew that Mr. Roybal was suffering ongoing severe and extreme pain from September 12, 2020, through December 11, 2020, but took no action to ensure Mr. Roybal received medical care to treat his medical emergency. Instead, like Wexford personnel, they accused him of faking and drug seeking.

75.    Upon information and belief, none of the Doe Corrections Officers requested or insisted that Mr. Roybal be evaluated medically and/or transported to an off-site medical facility to address his medical emergency. Due to Mr. Roybal's ongoing complaints of severe pain, the need for medical attention was obvious, even to a lay person.

**B.    Cursory Medical Treatment**

76.    From September 12, 2020, to December 11, 2020, only cursory treatment, amounting to a façade, was provided to Mr. Roybal despite:

    a.    Knowledge of extreme 10/10 pain from September 12, 2020, to December 11, 2020.

14

b.      Noted risk of osteomyelitis on October 23, 2020.

c.      Noted need for CT scan on October 28, 2020.

d.      Noted rib pain beginning September 12, 2020, and mid-back pain beginning September 15, 2020.

77.      Rather than heed the warnings of likely osteomyelitis and conduct proper diagnosis, including CT scans and MRI imaging, Wexford medical personnel provided only a modicum of care amounting to no medical care at all.

78.      Wexford personnel recklessly ignored Mr. Roybal's complaints of rib pain and mid-back pain that radiated to other parts of the body, focusing all diagnostic orders on his lower back.

79.      Cursory, or a modicum of medical care in the case of Mr. Roybal's serious emergent spinal infection, thought to be osteomyelitis, and months of severe pain, amount to deliberate indifference to Mr. Roybal's serious medical needs.

80.      The same cursory treatment is conscience shocking given that there was a virtual epidemic of osteomyelitis among the NMCD inmate population.

81.      As a direct and proximate cause of the failures to provide any meaningful medical treatment, Mr. Roybal suffered months of needless and avoidable pain and the deterioration in his spine, which ultimately led to the need for his spine surgery.

C.      **Failure to Intervene**

82.      All Defendants had a duty to intervene to protect the health and safety of Mr. Roybal.

83.      The NMCD Health Services Administrator, Director of NMCD Office of Inspector General, Bureau Chief for NMCD's Office of Internal Audits and Standards Compliance had the

authority and duty to intervene with medical contractors in cases where constitutionally adequate care is not being provided.  Rather than intervene, they acquiesced in the reckless denial of medical care to NMCD inmates, including Mr. Roybal.  Upon information and belief, Wence Asonganyi, Hope Salazar and Orion Stradford served in these positions during the times relevant to this Complaint.

84.     The Statewide Grievance Manager is the ultimate gatekeeper.  Upon information and belief, Steve Madrid was serving in this position at all times relevant to the complaint.  As will be seen below, Steve Madrid and other Health Services Administrators have completely breached their duty in this role rendering the medical grievance processes and procedures a sham.

85.     Nurse Chamblin and Dr. Acharya violated both their treatment roles and their gatekeeper roles in ignoring signs of thoracic spine osteomyelitis and failure to provide proper pain management and their failures to recommend proper diagnostics on Mr. Roybal's thoracic spine.

86.     For Wexford's part, the Collegial Review/Utilization Management processes and procedures serve as the ultimate gatekeeper to medical care.  Upon information and belief, it is the utilization management manager and committee that make decisions regarding referrals for outside medical care beyond the capabilities of Wexford.  Dr. Robert Smith was involved in the utilization management/collegial review process with Mr. Roybal.  Dr. Smith and all others served in a utilization management role, including Diana L. Grover (Regional VP of Operations/Utilization management) and Leanne Fudor, RN, BSN (LCCF Director of Utilization Management).

87.     Cpt. Joshua Fike, Sgt Leo Gomez and Sgt Jessica Jaimes all knew that Mr. Roybal was complaining of severe 10/10 pain and that he was having trouble walking.  Each accused Mr. Roybal of using drugs, faking his pain and seeking drugs.  None intervened when it was clear,

even to a layman, that Mr. Roybal's condition was worsening, significantly becoming critical. None reported this to their supervisors because, upon information and belief, GEO does not impose a duty to do so.

**D.    Hospitalization/Medicaid**

88.    Mr. Roybal was hospitalized at UNM Hospital from December 12, 2020, to December 17, 2020, as a result of the deliberate indifference to his serious medical needs, including months of extreme pain that he rated 10/10.

89.    Upon information and belief, Wexford paid $0.00 for Mr. Roybal's hospitalization.

90.    Upon information and belief, Medicaid paid for the hospitalization of Mr. Roybal.

91.    Upon information and belief, Medicaid or Medicare pay for all inmate hospitalizations of 24 hours or more for NMCD inmates under the care of Wexford.

92.    Upon information and belief, Wexford never pays for inmate hospitalizations lasting 24 hours or more in New Mexico, or anywhere in the U.S., where Wexford provides medical care to inmate populations.

93.    This creates perverse incentives for Wexford to delay outside referrals until the need for medical care becomes critical, more than likely requiring a hospital stay more than 24 hours.

94.    NMCD shares in the responsibility for this practice as it was written into the PSC, as well as the contractor with Wexford's predecessor, that Medicaid pays for hospitalizations lasting 24 hours or more. This is a proximate cause of the high number of undiagnosed and untreated cases of spinal osteomyelitis, infective endocarditis and sepsis related thereto. The Medicaid loophole was a proximate cause of Mr. Roybal's injuries.

### E.    Post-Op Denial of Prescribed Care

95.    Mr. Roybal was at UNM Hospital from December 12, 2020, to December 17, 2020, for chronic thoracic osteomyelitis.  Upon discharge, he was prescribed high dosage oral antibiotic ciprofloxacin with the recommendation that he be monitored with an EKG after (5) doses and be followed by UNMH OPAT within 2 to 3 weeks after discharge.  Additionally, it was recommended that the "prison provider" check Mr. Roybal's WBC, ESR, and CRP weekly for six weeks following discharge during his oral antibiotic therapy.  He was prescribed a pain regimen of acetaminophen, ibuprofen, and oxycodone.

96.    Mr. Roybal was scheduled, by the UNM providers with UNMH neurosurgery, for staple removal to be completed on January 14, 2021.

97.    Mr. Roybal was recommended to complete skilled physical therapy to assist in pain management, positioning, bracing techniques, and to help strengthen and stabilize the spine through therapeutic exercise as well as to improve overall strength and functional mobility.

98.    Following his discharge, Mr. Roybal was returned to LCCF.  Upon his return, he was monitored by medical personnel for two days on December 18 and 19, 2020.  After December 19, 2020, the monitoring ended.

99.    Mr. Roybal did not receive skilled physical therapy, or any type of physical therapy, upon his return to LCCF, against the recommendations made by UNM providers.

100.    Upon information and belief, Mr. Roybal did not receive the recommended EKG, as recommended by UNM providers.

101.    Upon information and belief, Mr. Roybal did not have his staples removed in accordance with the recommendations made by UNM providers.

102.    Upon information and belief, Mr. Roybal was not scheduled for his follow-up visit with UNMH OPAT, as recommended by UNM providers.  .

103.    Upon information and belief, Mr. Roybal was not administered his full course of oral antibiotics/

104.    Upon information and belief, Mr. Roybal was not provided with an appropriate pain medication regimen to address his ongoing post-surgical pain.

105.    Instead, Mr. Roybal submitted multiple health service request forms (December 23, 2020, December 30, 2020, January 10, 2021, January 12, 2021, January 19, 2021, and January 25, 2021) seeking medical help for ongoing severe pain, wound care, and problems with mobility issues.

106.    These requests were ignored by medical personnel.

107.     The Wexford Defendants' failure to adhere to the treatment recommendations made by the UNM providers caused Mr. Roybal additional harm, increased Mr. Roybal's pain and suffering, and upon information and belief, adversely impacted his overall prognosis and healing.

108.    The failure to provide follow up care was intentional, callous and cruel, heaping harm upon harm on Mr. Roybal.

109.    Wexford, by and through its employees, staff and agents, was deliberately indifferent to Mr. Roybal's health and safety.

**F.    Wexford, NMCD and GEO's Policies and Practices**

110.    By contracting with NMCD, Wexford agreed to provide a level of care consistent with NMCD's own rules, policies and procedures. Similarly, per the "applicability" specifications in the NMCD policies themselves, NMCD and contracted personnel were required to follow

NMCD's rules, policies, and procedures while acting within the scope of their employment and/or contract.

111.    The explicit terms of the PSC required Wexford to comply with NMCD's rules, policies, and procedures, which were frequently referenced in the PSC. Accordingly, both Wexford and NMCD knew of these policies and knew that they were not being followed by Wexford and NMCD personnel.

112.    Defendants Tafoya, Asonganyi, Stradford and Salazar had oversight responsibility over Wexford and its employees and agents to ensure compliance with the terms of the PSC and to ensure compliance with NMCD rules, policies, and procedures. Defendants Tafoya, Asonganyi, Stradford and Salazar completely failed, and continue to fail, in their oversight duties over Wexford.

113.    Defendant Tafoya, in particular, has even, over complaints related to medical care by her own employee correctional officers, ignored the deliberate indifference of Wexford (by and through its employees, staff and agents) to the health and safety of NMCD inmates.

114.    Defendant Madrid (or the Acting Statewide Grievance Manager) had oversight responsibility for the medical grievance process and procedures to insure that inmate medical grievances were addressed in a serious manner. Madrid completely failed this duty.

115.    Wexford routinely violated the terms of the PSC as well as NMCD rules, policies and procedures in the provision of medical care to NMCD inmates, including the care provided to Mr. Roybal.

116.    Wexford, and all of the individually named Wexford personnel, violated NMCD rules, policies, and procedures with respect to the medical care provided to Mr. Roybal.

117.    Neil Fisher, MD, CCHP (Wexford Statewide Medical Director), Dr. Keshab Paudel (Wexford Regional Medical Director), Mindy Lewis (Wexford Southern Regional Manager (LCCF)), Elizabeth Caraveo (Wexford Quality Improvement Coordinator), Ronald J. Smith, Pysd, CCHP-MH (Wexford LCCF Responsible Health Authority), Thomas M. Lehman, MD, CCHP (Wexford Corporate Medical Director/Clinical Services) and Diana L. Grover (Wexford Transitional Regional VP of Operations/Utilization management), all allowed, and by inaction, encouraged violations of the terms of the PSC, NMCD policies and American Correctional Association (ACA) guidelines. The individually named NMCD Defendants did not intervene to correct the violations, and NMCD and the individual NMCD Defendants both acquiesced and colluded in the violations, and actively violated its own rules, policies and procedures.

118.    Upon information and belief, GEO did not intervene to correct the violations and GEO both acquiesced and colluded in the violations of inmate constitutional rights to medical care.

119.    As a result of the violations of NMCD rules, policies, and procedures by all Defendants, Mr. Roybal received constitutionally inadequate medical services, his physical condition deteriorated severely and he now suffers from a life-long disability.

120.    In failing to address Mr. Roybal's medical concerns, Wexford and NMCD personnel violated the following NMCD policies, among others:

    a.    CD-032200(G): "Inmates shall be protected from personal abuse, corporal or unusual punishment, humiliation, mental abuse, personal injury, disease, property damage, harassment or punitive interference with the daily functions of living, such as eating and sleeping."

    b.    CD-170100(E-F): "Inmates who need health care beyond the resources available in the facility, as determined by the responsible health care practitioner, are

transferred under appropriate security provisions to a facility where such care is available. . . . A transportation system that assures timely access to services that are only available outside the correctional facility is required."

    c.    CD-170100(G): "A written individual treatment plan is required for inmates requiring close medical supervision, including chronic and convalescent care."

    d.    CD-170100(T): "Medical or dental adaptive devices (eyeglasses, hearing aids, dentures, wheelchairs, or other prosthetic devices) are provided when medically necessary as determined by the responsible health care practitioner."

    e.    CD-170100(DD): "The contract with the healthcare vendor shall ensure that levels of care and operations meet the standards of ACA [American Corrections Association] and NCCHC [National Commission on Correctional Health Care] as well as the policies and directives of the NMCD and its Medical Authority."

    f.    CD-170100(FF): "All state and private facilities that house state inmates shall follow procedures and practices that are in compliance with Corrections Department policy, ACA, and NCCHC standards."

    g.    CD-170100(GG): "Inmates with disabilities shall be housed in a manner that provides for their safety and security."

    h.    CD-170101(A)(2-4): "When necessary services are not available on-site, provisions shall be made for transfer of the inmate to another facility within the NMCD or to a community provider where such services are available. . . .It shall be the responsibility of custody staff to provide for adequate and timely transportation of inmates for off-site medical services."

i.    CD-170101(J)(4): "Urgent or emergency transports will be conducted immediately upon the determination by the medical staff that it is necessary."

j.    CD-170101(R)(3-4): "Procedures which cannot be accomplished at the facility shall be scheduled at an off-site facility. Scheduled medical procedures will not be delayed because of fiscal constraints when the following conditions exist: a. When pain is a manifestation of the medical condition and the treatment of choice for the potential alleviation of the pain is a scheduled procedure. b. When the deterioration of a person's health status associated with the progression in a chronic disease can be halted or significantly slowed by the scheduled procedure or c. When a disabling malady poses a life threatening or permanently disabling situation or a significant constraint to the person's rehabilitation and the scheduled procedures is the treatment of choice."

k.    CD-173100(A)(1): "When qualified health personnel, the local health care authority, the Warden, or the Shift Commander identifies an emergency medical situation that could result in the loss of life or serious harm to an inmate, he or she will immediately call 911 and request ambulance transport for the inmate to the nearest appropriate health care facility."

l.    CD-176100(A)(1): "The NMCD Health Services Bureau and the Behavioral Health Services Bureau shall ensure that all inmates are treated with dignity and respect and in a manner that recognizes their basic human rights."

121.    Wexford has violated these policies consistently since the inception of the PSC. NMCD has done nothing to address these persistent violations, which upon information and belief, are ongoing.

122.    Because Wexford violated the above policies, Mr. Roybal received constitutionally inadequate medical services and his physical condition deteriorated severely.   The actions of Defendants caused Mr. Roybal severe and permanent harm.

**G.    Wexford's Widespread Patterns and Practices of Providing Unconstitutional Medical Care Were Known to NMCD.**

123.    Wexford maintained various widespread patterns, practices and *de facto* standard operating procedures both in New Mexico and throughout the United States, which contributed to Mr. Roybal's severe injuries, including:

a.    Failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions.

b.    Delaying or denying patient referrals to necessary emergency or other offsite medical services.

c.    Severely understaffing its medical and mental health facilities.

d.    Failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff.

e.    Alteration, concealment and destruction of medical records.

f.    Failing to adequately hire, retain, train, and supervise its employees and agents on procedures necessary to protect patients' health.

g.    Failure to reprimand, provide additional training, retrain or take any other corrective action against Wexford medical providers engaging in cruel, callous and unconstitutional denial of medical care to inmates. Instead, Wexford corporate and supervisory personnel actively collaborate with, and direct Wexford medical providers in,

a manner resulting in the routine denial of medical care to NMCD inmates thus ratifying the behavior.

      h.     Wexford had a pattern and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions and of delaying or denying patients access to critical off-site medical services, which were contributing factors to Mr. Roybal's injuries.

      i.     As in the instant case, Wexford medical providers' signatures are largely illegible, making the identification of medical providers from the medical records impossible. Due to the persistent nature and the fact that legible medical records, signatures, and title of the medical provider are mandated by NMCD policy CD-170801, this, upon information and belief, is deliberate.

      j.     Routine failure to conduct differential diagnoses on inmate patients.

124.    Neil Fisher, MD, CCHP (Wexford Statewide Medical Director), Dr. Keshab Paudel (Wexford Regional Medical Director), Mindy Lewis (Wexford Southern Regional Manager (LCCF)), Elizabeth Caraveo (Wexford Quality Improvement Coordinator), Ronald J. Smith, Pysd, CCHP-MH (Wexford LCCF Responsible Health Authority), Thomas M. Lehman, MD, CCHP (Wexford Corporate Medical Director/Clinical Services) and Diana L. Grover (Wexford Transitional Regional VP of Operations/Utilization management) all allowed, and by inaction encouraged, the reckless and deliberate neglect of inmate health and safety addressed in the preceding paragraph.

125.    NMCD and Wexford have a longstanding policy and practice, directed, supervised and/or ratified by NMCD supervisory personnel, the NMCD Individual Defendants, and/or Wexford supervisory personnel under which employees and agents of Wexford and NMCD,

including correctional officers and medical personnel, failed or refused to: (1) report, diagnose, and properly examine, monitor, and treat prisoners with serious medical and/or mental health conditions, including failing to provide proper medications to prisoners with serious medical and/or mental health conditions; (2) respond to prisoners who requested medical and/or mental health services; (3) respond to prisoners who exhibited clear signs of a medical and/or mental health need or illness; (4) adequately document and communicate the medical and mental health needs of prisoners to the appropriate correctional officers and/or medical or mental health staff; (5) timely refer prisoners for emergency or other offsite medical services, or (6) intervene in any way to protect the health and safety of inmates.

126.    Specifically, Alisha Tafoya, Wence Asonganyi, Hope Salazar, Orion Stradford and Steve Madrid all knew of these practices and adopted them as their own due their intentional failure to remedy the persistent and ongoing violations of the constitutional rights of inmates to medical care.

127.    These practices, amounting to standard operating procedures (SOP), are clearly illustrated in court cases spanning decades throughout the United States. In addition, the practices/SOP have been extensively and expansively covered by the media, including New Mexico media.

128.    The practices/SOP were present under a past contract with NMCD and were the basis for termination of the contract with Wexford in 2007.  Yet, NMCD saw fit to bring Wexford back in 2019, despite the obvious risks to NMCD inmates' lives and health.

129.    NMCD and the individual NMCD Defendants had knowledge, through its own institutional experience, with Wexford's pervasive and persistent constitutionally deficient

medical care. In addition, NMCD and the individual NMCD Defendants can be imputed knowledge from all the cases and media reports documenting the same.

130.    Rather than take corrective action or intervene in any meaningful way, NMCD and the individual NMCD Defendants were complicit, acquiesced in and actively aided in each of the Wexford practices set forth above.

131.    In essence, Wexford's medical care of NMCD prisoners effectively amounted to no medical care at all, a fact of which NMCD Defendants are well aware.

132.    Wexford and the NMCD Defendants knew of the substantial risk of serious or fatal consequences that the practices above caused in the past, as well as the ongoing harm to NMCD inmates, yet they colluded and conspired to maintain those policies and practices.

133.    Upon information and belief, Wexford maintained their constitutionally deficient practices in order to maximize profit and without regard to its constitutional and medical obligations to NMCD prisoners, including Mr. Roybal, who were entrusted to Wexford's care.

134.    The practices set forth throughout this complaint were the moving forces behind the misconduct at issue in the instant case.

135.    As a result of Defendants' unlawful conduct, Mr. Roybal suffered serious and permanent personal injuries to include a T6-T12 posterior fusion, permanent disability, emotional and physical pain and suffering, loss of enjoyment of life, future medical expenses and future rehabilitation expenses, entitling him to an award of compensatory and punitive damages.

136.    Punitive damages or exemplary damages are appropriate against the Defendants as the actions and inactions of the individual Defendants were intentional, malicious, callous, cruel and wanton and undertaken with deliberate indifference to Mr. Roybal's health and safety and were adopted and ratified by Wexford, NMCD and GEO.

**H.**   **Medical Grievance Obstruction**

137.   According to American Correctional Association Audits (ACA) of LCCF:

    a.   In 2021, 5 of 735 medical grievances were found in favor of an inmate.

    b.   In 2019, 0 of 157 medical grievances were found in favor of an inmate.

    c.   In 2015, 0 of 79 medical grievances were found in favor of an inmate.

    d.   In 2012, 1 of 66 medical grievances were found in favor of an inmate.

    e.   All told, 6 or 1037 (.005786) medical grievances were found in favor of an inmate.

138.   According to those same audits, LCCF received the following scores from the ACA:

    a.   For 2021, LCCF received a grade of 100% on mandatory compliance items, and 99.77% on non-mandatory items.

    b.   For 2019, LCCF received a grade of 100% on mandatory compliance items, and 99.7% on non-mandatory items.

    c.   For 2015, LCCF received a grade of 100% on mandatory compliance items, and 100% on non-mandatory items.

    d.   For 2012, For 2021, LCCF received a grade of 100% on mandatory compliance items, and 99.5% on non-mandatory items.

139.   Upon information and belief, as Statewide Grievance Manager, Defendant Steve Madrid, or his successor, was ultimately responsible for the NMCD medical grievance system. Upon information and belief, neither Steve Madrid nor his successor have medical training.

140.   There is a long-standing pattern of ignoring medical grievances on the part of NMCD and its contractors. NMCD does not track the number of medical grievances filed against

individual medical personnel, nor does NMCD track medical grievances filed for specific medical issues such as osteomyelitis and sepsis. NMCD Health Services Administrator ("HSA") Wence Asonganyi testified by deposition on December 13, 2022, that no remedial action has been taken against any medical contractor employee or staff based upon a medical grievance or even numerous medical grievances.

141.    Medical grievances at the facility level are addressed by correctional officers serving as grievance officers. Upon information and belief, these grievance officers have no medical training.

142.    HSA Wence Asonganyi testified further that the HSA is not involved in the medical grievance process, which means that the only people involved in the NMCD medical grievance process are correctional personnel and administrators with no medical training. In short, medical grievances are reviewed and ruled upon by unlicensed and medically untrained NMCD personnel.

143.    Finally, the current HAS, Wence Asonganyi, testified he does not know how grievances related to healthcare noted on the American Correctional Association audits are defined. Specifically, he does not know if the numbers related to informal complaints, formal grievances or grievance appeals.

144.    NMCD is ultimately responsible for the medical grievance process for all NMCD inmates, including those at LCCF.

**I.    Conspiracy to Violate Inmate Rights to Constitutionally Mandated Medical Care**

145.    Both GEO and NMCD, acting by and through their respective employees, staff and agents, are aware, and have been aware since the inception of the PSC, that Wexford does not provide constitutionally adequate medical care to NMCD inmates, including those housed at LCCF.

146.    Both GEO and NMCD, acting by and through their respective employees, staff and agents, acquiesced in and encouraged by omission Wexford's persistent failures to provide constitutionally adequate medical care.

147.    Wexford has, time and time again, failed to diagnose or treat clearly emergent infections resulting in numerous and untold cases of osteomyelitis and sepsis, including numerous cases of spinal osteomyelitis.

148.    Wexford's reckless disregard of emergent infections, along with the acquiescence of NMCD and GEO, acting by and through their respective employees, staff and agents, led to the injuries to Mr. Roybal.

149.    Wexford's reckless disregard and deliberate indifference to inmate health and safety is ongoing and still NMCD has taken no action to address the constitutional violations of inmate rights to medical care.

150.    The same holds true for GEO, who is ultimately responsible for the operation of LCCF.

151.    All named Defendants caused the harm to Mr. Roybal and countless other inmates.

152.    All named Defendants should suffer punitive damages to force Wexford to uphold its duties to provide constitutionally adequate medical care and to deter further constitutional violations by Wexford and its employees, staff and agents.

**COUNT I:    42 U.S.C. § 1983**
**DENIAL OF MEDICAL CARE IN VIOLATION OF THE EIGHTH AMENDMENT**
**(AGAINST ALL DEFENDANTS)**

153.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

154.    As described above, Defendants had notice of Plaintiff's medical needs, and the seriousness of his medical needs, and they knew the risk of harm he faced if he did not receive

appropriate medical care. Despite that knowledge, Defendants failed to provide Plaintiff with proper medical care, or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

155.    The misconduct described above and in this count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference, to Plaintiff's rights.

156.    Defendants were deliberately indifferent to Plaintiff's objectively serious medical needs and their actions were undertaken intentionally, with malice, and/or with reckless indifference to his rights.

157.    Plaintiff's injuries were proximately caused by Defendants' misconduct.

158.    At all times relevant to the events at issue in this case, Defendant Wexford contracted with the State of New Mexico to provide healthcare to NMCD inmates including those imprisoned at LCCF to include Plaintiff. As the provider of healthcare services to prisoners at LCCF and other NMCD facilities, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in NMCD custody.

159.    Before the events giving rise to Plaintiff's complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional employees at LCCF, pursuant to which prisoners such as Plaintiff with serious medical needs were routinely denied medical care and access to medical care. It is common, at LCCF, to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment and whose requests are routinely delayed or completely ignored by healthcare and correctional employees.

160.    NMCD and Wexford have an extensive history of deliberate neglect of the serious medical needs of inmates amounting to policy, practice and procedure throughout NMCD facilities statewide and specifically at LCCF.  These policies, practices and procedures have resulted in many extensive and avoidable hospitalizations and severe and permanent harm and/or death to NMCD inmates. These policies, practices and procedures were present in LCCF and were a driving force leading to Mr. Roybal's injuries.

161.    Specifically, there exist widespread policies or practices between NMCD and Wexford statewide and at LCCF by which prisoners, including Mr. Roybal, are deliberately, callously and maliciously denied medical care.

162.    These policies and practices include:

a.    Healthcare personnel commonly fail to respond, or respond inadequately, to prisoners who have requested medical attention or medication, or asked to see a doctor.

b.    Healthcare personnel commonly fail to respond, or respond inadequately, to prisoners who exhibit obvious signs of a serious medical condition.

c.    Healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition,

d.    Healthcare personnel commonly refuse, or otherwise fail, to refer inmates to outside medical providers for proper diagnostics or treatment when such is not available within the NMCD facility, including LCCF.

e.    Healthcare personnel commonly fail to review a prisoner's pertinent medical records before, during, or after an examination or diagnosis of the prisoner.

f.    Healthcare personnel with inadequate training, qualifications, and experience are responsible for screening and evaluating prisoner complaints and requests

for medical care.

g.    Medically untrained correctional personnel in the employment of NMCD and/or GEO are making determinations on the validity of medical grievances.

h.    Healthcare personnel fail to provide timely healthcare to prisoners.

i.    Healthcare personnel fail to respond adequately or timely to diagnostic testing that reveals a serious medical need.

j.    NMCD and healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

k.    Inadequate levels of health care staffing are maintained.

163.    Despite knowledge of these problematic policies and practices, all Defendants did nothing to ensure prisoners at LCCF, including Mr. Roybal, received adequate medical care and access to medical care, thereby acting with deliberate indifference.

164.    These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services at LCCF, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees.

165.    These widespread policies and practices were allowed to flourish because Defendants Wence Asongnyi, Hope Salazar, Orion Stradford and Steve Madrid, who are all responsible for overseeing medical care provided by medical contractors such as Wexford, contract compliance, ACA compliance and compliance with constitutional standards, have been complicit for years in the reckless and deliberately indifferent failures to provide even basic medical care and diagnostics for inmates in the custody of NMCD, including LCCF, suffering from emergent, easily managed infections that have gotten into the spines and hearts of inmates.

166.    These policies and practices directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

167.    The above-described widespread policies and practices, so well settled as to constitute *de facto* policy at all NMCD facilities including LCCF, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

168.    At all times relevant to their involvement in this case, Neil Fisher, MD, CCHP (Wexford Statewide Medical Director), Dr. Keshab Paudel (Wexford Regional Medical Director), Mindy Lewis (Wexford Southern Regional Manager (LCCF)),  Elizabeth Caraveo (Wexford Quality Improvement Coordinator), Ronald J. Smith, Pysd, CCHP-MH (Wexford LCCF Responsible Health Authority), Thomas M. Lehman, MD, CCHP (Wexford Corporate Medical Director/Clinical Services) and  Diana L. Grover (Wexford Transitional Regional VP of Operations/Utilization management), were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at LCCF; the training of NMCD and Wexford staff at LCCF on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of NMCD and Wexford staff at LCCF who provided medical care and were responsible for providing prisoners access to medical care.

169.    Before the events giving rise to Plaintiff's complaint, the Defendants identified in the preceding paragraph had notice of widespread policies and practices by healthcare and correctional employees at LCCF pursuant to which prisoners such as Plaintiff with serious medical

needs were routinely denied medical care and access to medical care. It is common at LCCF to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment and whose requests are routinely delayed or completely ignored by healthcare and correctional employees.

170.    Plaintiff's injuries were caused by employees of NMCD and Wexford, including, but not limited to, the individually named Defendants who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this count.

## COUNT II:    42 U.S.C. § 1983
## FAILURE TO INTERVENE IN VIOLATION OF THE EIGHTH AMENDMENT
### (AGAINST ALL INDIVIDUALLY NAMED DEFENDANTS)

171.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

172.    As described above, all individually named Defendants had a reasonable opportunity to prevent the violation of Plaintiff's constitutional rights, but chose not to do so.

173.    Defendants' failure to act was intentional, done with malice, and/or done with reckless indifference to Plaintiff's rights.

174.    As a direct and proximate result of above-identified Defendants' misconduct, Plaintiff's rights were violated and he suffered injuries, including pain, suffering, emotional distress and severe permanent spinal damages.

175.    Plaintiff's injuries were caused by the above-stated failures to intervene in violation of gatekeeper duties along with the policies and practices of all Defendants set forth above.

## COUNT III:  42 U.S.C. § 1983
## CONSPIRACY TO DENY MEDICAL CARE IN VIOLATION
## OF THE EIGHTH AMENDMENT
### (NMCD and Wexford Defendants)

176.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

177.    Defendants NMCD and Wexford reached a meeting of the minds, evidenced by

persistent, pervasive and ongoing denial of medical care by Wexford and among themselves, to deprive Plaintiff of his constitutional rights and to protect one another from liability for depriving Plaintiff of his rights, all as described in the various paragraphs of this complaint.

178.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

179.    The misconduct described in this count, was undertaken intentionally, with malice, and/or with reckless indifference to Plaintiff's rights.

180.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated and he suffered injuries, including pain, suffering, and emotional distress.

181.    Plaintiff's injuries were caused by employees of NMCD and Wexford, including, but not limited to, the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief against Defendants, jointly and severally:

A.    Monetary damages against Wexford and individual Defendants sued under 42 U.S.C. § 1983, in their individual capacities, in an amount to be determined at trial to compensate Plaintiff for the injuries he sustained as a result of the events and conduct alleged herein;

B.    Punitive damages against all Defendants in an amount to be determined at trial;

C.    Statutory interest on any and all damages awarded to Plaintiff;

D.    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)

on all issues in this case so triable.

Dated: December 8, 2023

Respectfully Submitted:

COLLINS & COLLINS, P.C.

*/s/ Parrish Collins*
Parrish Collins
Francheska Bardacke
P. O. Box 506
Albuquerque, NM  87103
(505) 242-5958
parrish@collinsattorneys.com
francheska@collinsattorneys.com

-and-

DELARA | SUPIK | ODEGARD P.C.

*/s/ Alisa Wigley-DeLara*
Christopher J. DeLara
Christopher J. Supik
David C. Odegard
Alisa Wigley-DeLara
P.O. Box 91596
Albuquerque, NM 87199
(505) 999-1500
chris@delaralaw.com
supik@delaralaw.com
odegard@delaralaw.com
alisa@delaralaw.com

*Attorneys for Plaintiff*